**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GRACE SMITH, MICHAEL O. SMITH, AND J.A. SMITH (MINOR CHILD),** *Plaintiffs*, **v.** **NORTHAMPTON COUNTY, et al.,** *Defendants*. | **CIVIL ACTION NO. 22-3788** |

## MEMORANDUM OF DECISION

BAYLSON, J.                                                        February 3, 2022

### I.   INTRODUCTION

This case is one of several filed by pro se Plaintiffs[1] with the Court, each against myriad

different defendants but all stemming from the same alleged chain of events.  That chain of

events occurred in the hours and days following the birth of Plaintiff J.A. Smith ("Baby J.A.S.")

to Plaintiff Grace Smith and her husband Plaintiff Michael Smith on a late Thursday evening in

April 2021 at St. Luke's Hospital in Easton, Pennsylvania.  Mr. and Mrs. Smith allege that over

the course of the 72 hours following Baby J.A.S.'s birth, they were illegally barred from taking

Baby J.A.S. home with them and were subject to illegal visiting restrictions, all due to a faulty

drug test result and without constitutionally required due process.

Here, the three Plaintiffs bring several claims in their Complaint against the Pennsylvania

counties whose administrators and caseworkers were allegedly involved in these events, as well

as against the individual administrators and caseworkers themselves.  These defendants include

Northampton County, Monroe County, Monroe County Office of Children and Youth

---

[1] Plaintiffs requested to proceed in forma pauperis, which the Court denied.  See Order Denying Motion To Proceed IFP, Grace Smith, et al. v. St. Luke's Hospital University Healthcare Network Anderson Campus, et al., No. 5:22-cv-1478-MMB (ECF 6).  Plaintiffs have chosen to proceed pro se.

administrator Adelaide Grace, Monroe County CYS caseworkers Tim Shaw, Jorge Manteria and 'Tonya 402,' and Northampton County Children, Youth and Families administrator Julie Bator. The claims include violations of procedural due process, violations of substantive due process, violations of equal protection, and unreasonable search and seizure.  Defendants have filed this Motion to Dismiss Plaintiffs' Complaint, on which the Court now rules.

For the reasons stated below, the Court will grant Defendants' Motion with prejudice as to Grace and Michael Smith's federal claims and will dismiss Baby J.A.S.'s federal claims without prejudice on other grounds.

## II.     FACTS AND PROCEDURAL HISTORY

### A. Facts As Alleged

Sometime on April 8, 2021, Grace and Michael Smith arrived at St. Luke's Hospital, Anderson Campus ("St. Luke's" or "the hospital") located in Easton Pennsylvania, Northampton County.[2]  In the evening of April 8, Mrs. Smith gave birth to Baby J.A.S.

Sometime between April 8 and 9, Mrs. Smith was subjected to a urine drug screening by hospital staff.  The drug test returned a positive result for amphetamine or methamphetamine— the drug test employed by the hospital did not render differentiated results between these two compounds.  Immediately following the results of Mrs. Smith's drug test, the hospital contacted by telephone the Northampton County Children, Youth and Families Division ("Northampton CYS"), who then referred the case to the Monroe County Office of Children and Youth

---

[2] The Court draws this non-dispositive fact from one of the Smith's other complaints for the mere purpose of completion.  See Third Amended Complaint at 4, Grace Smith, et al. v. St. Luke's Hospital University Healthcare Network Anderson Campus, et al., No. 5:22-cv-1478-MMB, (ECF 45).  The rest of this section is taken from the Complaint (ECF 1) and Defendants' Motion (ECF 7) of the case at bar, 22-3788.

("Monroe CYS) based on the location of the Smiths' residence in Monroe County.[3]  The hospital reported that Mrs. Smith "tested positive for methamphetamine, and that she likely passed the deleterious effects of methamphetamine use on to her newborn."  Complaint ("Compl.") (ECF 1) at 3.  At this point, Baby J.A.S. was being held in the hospital's neonatal intensive care unit (NICU).[4]  Around 7:00 PM on April 9, hospital staff informed the Smiths that a report had been made to child services.  The Smiths explained that Mrs. Smith had a prescription for Vyvanse, which was also documented in the medical history submitted to the hospital and which probably caused the positive drug result.[5]  The Smiths then withdrew consent for Mrs. Smith and Baby J.A.S. as to any further medical treatment and sought to leave the hospital as a family.  The hospital proceeded to lockdown the NICU and police officers escorted the Smiths from the building without Baby J.A.S.

Before their forced departure from the hospital, the Smiths contacted Northampton CYS and were told that the case had been referred to Monroe CYS.  The Smiths then contacted Monroe CYS and reached Defendant 'Tonya 402,' who informed the Smiths that "because the case was referred on a Friday, and CYS was closed on the weekend, no caseworker would be assigned to the Smith case until Monday, April 12."[6]  Compl. at 4-5.  The Smiths allege that the

---

[3] Throughout the Complaint and Defendants' Motion, the parties refer to the respective counties' children and youth services agencies as "Children Youth Services," or "CYS."  For continuity with the briefs, the Court will also refer to these entities (which are not named as defendants by the Smiths) as "CYS."

[4] Defendants state in their Motion that Baby J.A.S. was born early and had fluid in his lungs, prompting medical staff to place him in the NICU.  Def. Mot. at 3.  Defendants cite to the Smith's original, 925-page complaint in support of this fact.  See Complaint at 46, Grace Smith, et al. v. St. Luke's Hospital University Healthcare Network Anderson Campus, et al., No. 5:22-cv-1478-MMB, (ECF 2).  For the facts dispositive to this motion, the Court will focus on the facts alleged by the Smiths in the four corners of their Complaint for the case at bar.

[5] Vyvanse is a stimulant medication used to treat Attention Deficit Hyperactivity Disorder.  See "Lisdexamfetamine Dimesylate," MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/lisdexamfetamine-dimesylate-oral-route/description/drg-20070888 (last viewed 2/2/2023).

[6] The Smiths list in the Complaint that 'Tonya 402' is an employee of Northampton CYS, but plead facts asserting that she is an employee of Monroe CYS.  Compl. at 3.

hospital "assumed care, custody, and control of Baby J.A.S. from April 9, 2021 through April 12, 2021, until CYS 'cleared' Mr. and Mrs. Smith to regain custody."  Compl. at 5.  Over the weekend, while Mr. Smith was barred from entering the hospital, Mrs. Smith was allowed to visit Baby J.A.S. in the NICU under security supervision.

On the morning of April 12, Tim Shaw, a Monroe CYS caseworker, met with Mrs. Smith at the hospital and conducted an interview.  Shaw took photos of Mrs. Smith's medications and collected an additional urine sample from Mrs. Smith.  He told Mrs. Smith that the reason a case was opened against the Smiths was because the hospital reported that Mrs. Smith had tested positive for methamphetamine.  When Mrs. Smith told Shaw that she'd been subject to round-the-clock security supervision over the weekend, Shaw stated that he'd advised the hospital on Saturday "you were ok to be here with the baby."  Compl. at 6.

Meanwhile, also on April 12, Monroe CYS caseworker Jorge Manteria visited the Smiths' residence to talk with Mr. Smith.  After meeting with Mr. Smith and his other children, Manteria concluded that the residence was safe.

Sometime on April 12, Baby J.A.S. was released from the custody of the hospital and permitted to go home with the Smiths.  Over the next few weeks, Monroe CYS continued to investigate the case against the Smiths, closing the case sometime in early May 2021.

**B.  Procedural History**

The procedural history of this case is somewhat convoluted.  On April 11, 2022, Grace, Michael and J.A. Smith filed a 925-page pro se complaint with the Court asserting various state and federal claims against scores of private and government defendants.  See Complaint, Grace Smith, et al. v. St. Luke's Hospital University Healthcare Network Anderson Campus, et al., No. 5:22-cv-1478-MMB, (ECF 2).  Grace Smith represents herself to be an attorney barred in

Pennsylvania, while Michael Smith represents himself to have graduated from law school but is not a barred attorney.

On June 16, 2022, the Court ordered Plaintiffs to file an amended complaint "that complies with the Federal Rules of Civil Procedure and the Local Rules of this Court" within 30 days.  See Order Re Plaintiffs' Complaint, Grace Smith, et al., No. 5:22-cv-1478-MMB, (ECF 21).  On June 22, 2022, Plaintiffs filed a 926-page amended complaint.  See First Amended Complaint, Grace Smith, et al., No. 5:22-cv-1478-MMB, (ECF 34).  Again, the Court ordered Plaintiffs to amend their complaint, this time expressly limiting it to 50 pages.  On July 11, 2022, Plaintiffs filed a second amended complaint consisting of a 51-page complaint and an accompanying 45-page brief.  See Second Amended Complaint, Grace Smith, et al., No. 5:22-cv-1478-MMB, (ECF 41).

Following a Rule 16 conference held at the courthouse, on July 14, 2022 the Court struck Plaintiffs' second amended complaint for failure to comply with the Federal Rules of Civil Procedure and Local Rules of this Court and ordered Plaintiffs to file "new, separate Complaints" of 50 pages or less.  See Order, Grace Smith, et al., No. 5:22-cv-1478-MMB, (ECF 43).  Specifically, the Court ordered Plaintiffs to file separate complaints (with separate case numbers) against groups of similar defendants, which would then all be assigned individually to the Court as related cases.  See July 14, 2022 Rule 16 Hearing Tr. at 20-21, Grace Smith, et al., No. 5:22-cv-1478-MMB, (ECF 48).  Plaintiffs eventually filed five separate complaints in adherence to this Order.

On September 14, 2022, Plaintiffs filed their Complaint in this case against Defendants. On November 20, 2022, Defendants filed this Motion to Dismiss, seeking to dismiss all of Plaintiffs' claims for failure to state a claim upon which relief can be granted.  See Def. Mot.

(ECF 6).  Before responding to this Motion, Plaintiffs filed a Motion for Default Judgment

(among many similar motions for sanctions across the five cases), which the Court denied.

Plaintiffs filed their Response to this Motion on December 13, 2022.  See Plf. Resp. (ECF 12-1).

With the Motion now ripe, the Court will consider Plaintiffs' claims, which include:

Count 1:  Unreasonable Search and Seizure,

Count 2:  Violations of Procedural Due Process,

Counts 3, 4 and 5: Violations of Substantive Due Process,

Count 6:  Violations of Equal Protection.

### III.    JURISDICTION

The Court has subject-matter jurisdiction over Plaintiffs' constitutional claims under 28

U.S.C. § 1311 (federal question jurisdiction) as they invoke federal law.

### IV.    DISCUSSION

#### A. Rule 12(b)(6) Standard of Review

In considering a motion to dismiss under FED.R.CIV.P. 12(b)(6), the Court "accept[s] all

factual allegations as true [and] construe[s] the complaint in the light most favorable to the

plaintiff."  Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (internal

quotations and citations omitted).  "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its

face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007)).  Although a court must accept as true all factual allegations contained in a

complaint, this requirement does not apply to legal conclusions; therefore, pleadings must

include factual allegations to support the legal claims asserted.  Iqbal, 556 U.S. at 678.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  Id.  (citing Twombly, 550 U.S. at 555); see also Phillips v. Cty. of

Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (citing Twombly, 550 U.S. at 556 n.3) ("We

caution that without some factual allegation in the complaint, a claimant cannot satisfy the

requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the

claim rests.")).  Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

Under the "John Doe Defendant" rules, the Court will consider for the Motion the claims

brought against Defendant "Tonya 402", who Plaintiffs describe in the pleadings as a caseworker

employed by Northampton County CYS.  See Blakeslee v. Clinton County, 336 Fed.Appx. 248,

250 (3d Cir. 2009) ("Use of John Doe defendants is permissible in certain situations until

reasonable discovery permits the true defendants to be identified. . . . If reasonable discovery

does not unveil the proper identities, however, the John Doe defendants must be dismissed").

**B.  Baby J.A.S.'s Claims**

For purposes of this Motion, the Court will not make a ruling as to the claims brought on

behalf of Baby J.A.S., who is included as a claimant for Counts 2, 3, 4 and 5.  Instead, the Court

instructs the parties to refer to this Memorandum of Decision's accompanying order on how to

proceed with Baby J.A.S.'s claims.  The Court's decision to proceed in this uncommon fashion is

based on an uncommon need given the facts of the case and the method by which it has been

litigated by Plaintiffs and is consistent with established precedent and the Court's reasoning

below.

The Third Circuit has held, unequivocally, that a parent who is not an attorney must be

represented by legal counsel in bringing an action on behalf of his or her minor children.  See

Osei-Afriyie by Osei-Afriyie v. Med. College of Pa., 937 F.2d 876, 878 (3d Cir. 1991)

(Hutchinson, J.).  In Osei-Afriyie, a plaintiff non-lawyer appealed a jury's defense verdict on a

series of federal and state claims he asserted on behalf of himself and his two minor daughters

against a hospital related to the hospital's alleged use of experimental treatment on the daughters.

In vacating the jury verdict as to the daughters' claims, the Third Circuit agreed with the Second

Circuit: "The choice to appear pro se is not a true choice for minors who under state law, cannot

determine their own legal actions.  There is thus no individual choice to proceed pro se for courts

to respect, and the sole policy at stake concerns the exclusion of non-licensed persons to appear

as attorneys on behalf of others."  Cheung v. Youth Orchestra Found. of Buffalo, Inc., 906 F.2d

59, 61 (2d Cir. 1990) (holding that a non-attorney parent must be represented by counsel in

bringing an action on behalf of his or her child).

However, the Third Circuit has not held whether a parent *who is* an attorney is permitted

to represent their minor child in litigation in which the parent also has a claim.  The closest the

Third Circuit has come to addressing this issue was Woodside v. Sch. Dist. of Philadelphia Bd.

of Educ., where the court held that an attorney-parent could not collect attorney's fees for his

successful representation of his minor child's claims in administrative proceedings under the

IDEA.  See 248 F.3d 129 (3d Cir. 2001).  Woodside can be distinguished from the case at bar

because the attorney-parent in Woodside did not have individual claims in the underlying

litigation, only the child-plaintiff did.  This distinction is important, because the Woodside

court's reasoning did not focus on the relationship between the parent-attorney and child-

plaintiff, but on the interpretation of the fee-shifting statute within the Act, quoting the U.S.

Supreme Court that "the statutory policy of furthering the successful prosecution of meritorious

civil rights claims is better served by a rule that creates an incentive to retain independent

counsel, rather than a rule that creates an incentive to represent one's self." Woodside, 248 F.3d at 131 (quoting Kay v. Ehrler, 499 U.S. 431, 438 (1991) (holding similarly that a pro se plaintiff who is an attorney cannot be awarded attorney fees under the fee-shifting provision of the Civil Rights Attorney's Fees Awards Act)). The Smiths' case calls for different focus, which is whether a parent-attorney can properly litigate the claims of their minor child that fall directly alongside the parent-attorney's own claims in the litigation. Cf. Doe v. Bd. of Educ. of Baltimore Cty., 165 F.3d 260, 263-64 (4th Cir. 1998) ("Like attorneys appearing pro se, attorney-parents are generally incapable of exercising sufficient independent judgment on behalf of their children to ensure that 'reason, rather than emotion' will dictate the conduct of the litigation.") (quotation omitted).

Indeed, the Third Circuit later adopted the reasoning from Doe in extending Woodside to hold that parent-attorneys could not collect attorney's fees from successful litigation of their child's IDEA claims in federal court, as opposed to administrative proceedings: "[W]e reached our conclusion [in Woodside] based on our observation that 'attorney-parents are generally incapable of exercising sufficient independent judgment on behalf of their children to ensure that reason, rather than emotion will dictate the conduct of the litigation.'" See Pardini v. Allegheny Intermediate Unit, 524 F.3d 419, 425 (3d Cir. 2008) (quoting Doe, 165 F.3d at 263).

Some courts have even acknowledged a further distinction—that specifically in an IDEA case, a parent-attorney representing their child is not acting pro se. See Doe, 165 F.3d at 263-64 (4th Cir. 1998). This distinction is important because without it, courts would necessarily have to interpret Woodside and Pardini to also stand for the proposition that parent-attorneys are permitted to represent their children in any litigation, since the Third Circuit's holdings fell short of banning such arrangements in those cases.

It should also be noted that both Mrs. Smith, a licensed attorney, and her husband Mr. Smith, who graduated law school but is not a licensed attorney, have entered appearances on behalf of themselves respectively.  On the docket, Baby J.A.S. is "represented by J.A.S. Smith." This must be an error.  It is unclear which parent has entered their appearance on behalf of the minor child.  Mr. Smith addressed the Court as if he had written the earlier complaints which Mrs. Smith then reviewed.  See July 14, 2022 Rule 16 Hrg. Tr. at 15, Grace Smith, et al., No. 5:22-cv-1478-MMB, (ECF 48).  Mr. Smith claims to have graduated law school but has not claimed that he is a licensed attorney.  Pennsylvania does not allow non-lawyers to represent parties before the courts.  GLTM Properties, LLC v. Rizvi, No., 2014 WL 10937119, at *1 n.1 (Pa. Super. Ct. Apr. 23, 2014) (citing to Osei-Afriyie).   Therefore, Mr. Smith's continued pro se representation of Baby J.A.S. is at odds with the holding in Osei-Afriyie.

Looking at both the facts of the case and the manner by which it has been litigated by the Smiths as can be gleaned from their filings, as well as the Third Circuit opinions and other persuasive reasoning outlined above regarding the Court's duty to protect the rights of the minor-child plaintiff, the Court concludes that Mr. and Mrs. Smith are too conflicted to provide adequate representation for their child's claims in this case, notwithstanding the single good-standing bar license of Mrs. Smith.  The facts of the case are as emotional and intense as they come: parents separated from their newborn child due to an allegedly faulty drug test.  For their part, the Smiths allege a string of continuing psychological injuries as result of these events that would make any lawyer question whether they are capable of a detached and competent representation.  The lengthy filings of the Smiths have been rife with language that resembles emotionally charged interjection rather than cogent legal argument.  Finally, the Smiths have failed to allege in their Complaint any injury suffered by Baby J.A.S. himself—they only allege

injuries that they themselves suffered, a theme consistent with the rhetoric of their Response

Brief and that on its face would usually doom a plaintiff's claims.  See Hedges v. Musco, 204

F.3d 109, 121 (3d Cir. 2000) ("It is axiomatic that a § 1986 action, like its tort analogs, employs

the principle of proximate causation.") (internal quotations omitted).  Furthermore, the ABA's

Model Rules provide that "[a] lawyer's own interests should not be permitted to have an adverse

effect on representation of a client. . . . [I]f the probity of a lawyer's own conduct in a transaction

is in serious question, it may be difficult or impossible for the lawyer to give a client detached

advice."  See ABA MODEL RULES OF PROFESSIONAL CONDUCT, Rule 1.7 Conflict of Interest:

Current Clients – Comment [10].

https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_pr

ofessional_conduct/rule_1_7_conflict_of_interest_current_clients/comment_on_rule_1_7/ (last

visited Feb. 1, 2023). The Smiths have only demonstrated that the Court must step in to uphold

its duty to the child-plaintiff in this situation.  Therefore, for the purposes of this Motion, the

Court will analyze and rule solely on the claims of the parent-plaintiffs, Mr. and Mrs. Smith.

 While this issue was not raised by any of the parties in this case, the issue is not therefore

waived.  "The right to counsel belongs to the children, and . . . the parents cannot waive this

right."  Osei-Afriyie, 937 F.2d at 883.

### C.  Count 1:  Fourth Amendment Claim

 The Smiths allege that Mrs. Smith's Fourth Amendment rights were violated by the

Monroe County Defendants when they "required Mrs. Smith to submit to a urine drug test."

Compl. at 25.  Specifically, the Smiths allege that Defendant Shaw, a Monroe County CYS

caseworker, "required Mrs. Smith to submit to another UDS" and "threatened to further withhold

Baby J.A.S. once more if Mrs. Smith did not submit to additional drug testing."  Id.  The Smiths

also allege that Defendant Grace, administrator for Monroe County CYS, is liable for Shaw's actions under the doctrine of superior liability and that Monroe County is liable under Monell municipality liability.

Defendants argue that they followed the law as prescribed in the relevant state statutes, and that the Smiths have failed to sufficiently plead Monell liability.  See Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658 (1978).  Defendants also argue that the individual defendants are entitled to qualified immunity.  For the reasons below, the Court finds that the Smiths have not pleaded sufficient facts to state a claim of unreasonable search and seizure.

To start, 42 U.S.C. § 1983 serves as a vehicle allowing a plaintiff to bring a cause of action against individual state actors for violating a right protected under the U.S. Constitution.[7] "It is settled law that the collection and analysis of a urine sample to test for drug use constitutes a search that is subject to the constraint of the Constitution's Fourth Amendment."  Kerns v. Chalfont-New Britain Twp. Joint Sewage Auth., 263 F.3d 61, 65 (3d Cir. 2001).  At this point, with Defendants having acknowledged that a CYS case had been opened against the Smiths, it is clear that the intention behind the drug test ordered by Mr. Shaw was to test Mrs. Smith for drug use, particularly methamphetamine use.  Searches "must meet the Fourth Amendment's reasonableness requirement."  Skinner v. Railway Labor Executive's Ass'n, 489 U.S. 602, 633-34 (1989).  Reasonableness in the realm of drug test searches can be deemed by limits on the discretion of the testers, "surpassing safety interests served by the toxicological tests," and whether there is a diminished expectation of privacy given the context of the test.  Id. at 634

---

[7] § 1983 states:  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . ."

(holding that post-accident drug testing of railroad employees authorized by federal statute constitutes a reasonable search).

Mr. Shaw's subjection of Mrs. Smith to a second drug test for methamphetamine pursuant to the now-opened CYS investigation was reasonable under the facts as alleged.  Mr. Shaw did not have any discretion in opening the case against the Smiths, as it is required conduct under Pennsylvania law.  See 55 Pa. Code § 3490.55 ("[T]he county agency shall begin its investigation within 24 hours of receiving a report of suspected child abuse.") (emphasis added). The safety interests are also apparent—the drug test was part of an investigation into a report of child abuse, and the government has a significant interest in maintaining the safety of children within its ambit.  Finally, Mrs. Smith's expectation of privacy was diminished when a child abuse case was opened against her as a result of the original positive drug test that was administered by the hospital.  Where there is a credible concern for the safety of others, the intrusiveness of a mandated drug test diminishes.  See Wilcher v. City of Wilmington, 139 F.3d 366, 375 (3d Cir. 1998) (firefighters subject to drug test had a diminished expectation of privacy because undetected drug use "poses a source of danger . . . to the community at large"); Transp. Workers' Union of Philadelphia, Local 234 v. Se. Pa. Transp. Author., 884 F.2d 709, 712 (3d Cir. 1989) (drug testing of railroad workers serves to prevent "great human loss" due to potential impairment).  In contrast, the level of intrusion on Mrs. Smith's privacy imposed by the drug test did not render it unreasonable.  "[T]he degree of intrusion [of a urinary drug test] depends upon the manner in which production of the urine sample is monitored."  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 658 (1995).  Plaintiffs do not allege facts describing the manner by which Mr. Shaw administered the second drug test.  The Court cannot assume that the manner by which Mrs. Smith provided Mr. Shaw with a urine sample was unreasonable, especially where the

character of a search "is a factual matter."  Wilcher, 139 F.3d at 375.  Because Plaintiffs have not

pleaded facts that would support a finding that drug testing method was unreasonably intrusive,

the Court cannot find that an unreasonable intrusion occurred.

In weighing these factors, the Court finds that the second drug test did not constitute an

unreasonable search.  Because Mrs. Smith's Fourth Amendment rights were not violated, the

Monroe County defendants cannot be found liable for that allegation under § 1983.  Plaintiffs

have already made numerous attempts to amend their allegations to sufficiently state a claim;

therefore, Count 1 will be dismissed with prejudice.

### D.  Count 2: Procedural Due Process Claims

Plaintiffs allege that they are entitled to relief under § 1983 for Defendants' failure to

"follow the legally required and appropriate procedures to have a newborn child removed into

protective custody from its parents."  Compl. at 27.  Plaintiffs appear to argue that Defendants'

conduct leading up to and during the CYS investigation of the Smiths violated Plaintiffs' rights

in at least one of two ways:  1) through Defendants' failure to adhere to state laws and

regulations governing child protection procedures, and 2) through Defendants' failure to adhere

to U.S. Supreme Court precedent governing Plaintiffs' procedural due process rights protected

by the federal Constitution in their investigation.

Defendants again argue that they followed the law as prescribed in the relevant state

statutes, and that Plaintiffs have failed to sufficiently plead Monell liability.  Defendants also

argue that the individual defendants are entitled to qualified immunity.

The Court addresses first Defendants' position that they "did not take physical or legal

custody of the child." Def. Mot. at 10.  Plaintiffs' allegations establish that the hospital was

responsible for taking custody of the child, not the Defendants.  Plaintiffs assume in their

14

Complaint that Defendants did take custody of Baby J.A.S. "by assent or instruction," and they base some of the allegations underlying their claims on this assumption. Compl. at 28. Plaintiffs do not plead any specific facts as to Defendants' instruction or assent to take Baby J.A.S. into custody. Considering Plaintiffs' allegations as true and in the light most favorable to them, the Court proceeds under the inference that once Defendants received the report from the hospital on April 9th, they possessed authority to instruct the hospital to release Baby J.A.S. and therefore took custody, "protective" or otherwise, of Baby J.A.S.

§ 1983 is a vehicle by which a plaintiff may bring a cause of action against a state actor for alleged violations of her federal rights. To state a claim under § 1983 for violation of one's procedural due process rights, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" Hill v. Borough of Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976). The Third Circuit has recognized that there is a "fundamental liberty interest of natural parents in the care, custody, and management of their child." Miller v. City of Philadelphia, 174 F.3d 368, 373 (3d. Cir. 1999). However, "this liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children." Croft v. Westmoreland Cty. Children and Youth Servs., 103 F.3d 1123, 1125 (3d. 1997). "This interest, however, must be balanced against the state's interest in protecting children suspected of being abused." Miller, 174 F.3d at 373 (3d. Cir. 1999). "The right to familial integrity, in other words, does not include a right to remain free from child abuse investigations." Croft, 103 F.3d at 1125 (3d. 1997).

"Section 1983 does not provide a cause of action for violations of state statutes."  Brown v. Grabowski, 922 F.2d 1097, 1113 (3d Cir. 1990).  Whether Defendants, as government actors affecting child protective services under the authority of state law, failed to adhere to the Pennsylvania statutes and regulations intended to guide their conduct is irrelevant to our analysis of their liability under § 1983.  Id. (state domestic violence statute was "effectively irrelevant" in court's analysis of § 1983 liability); but see Brown v. Daniels, 290 Fed.Appx. 467, 472 (3d Cir. 2008) ("'While not dispositive, the statutory scheme adopted by the Pennsylvania legislature in the familial integrity arena are highly relevant to this Court's consideration of [the procedural due process claims].'") (emphasis in original) (quoting Patterson v. Armstrong, 141 F.Supp.2d 512, 538 (W.D. Pa. 2001)).  Likewise, Defendants' arguments that their conduct was consistent with Pennsylvania law are also irrelevant under the same precedent.

"Due Process is flexible and calls for such procedural protections as the particular situation demands."  Morissey v. Brewer, 408 U.S. 471, 481 (1972).  In analyzing the question of whether Plaintiffs' liberty interest was violated without required recourse, the Court acknowledges that procedural due process rights protected under the Fourteenth Amendment generally guarantee a right to a prompt post-deprivation hearing.  Miller, 174 F.3d at 373 n.4 (3d Cir. 1999) ("Initiating child custody proceedings by ex parte orders is generally constitutional if a prompt post-deprivation hearing is held.").

The Smiths allege as follows concerning Baby J.A.S.'s hospital stay:  They were informed that the hospital had retained exclusive custody of Baby J.A.S. around 7:00 p.m. on April 9th.  Compl. at 4.  Mrs. Smith was permitted by the hospital to visit Baby J.A.S. the next morning, and Mrs. Smith stayed with and took care of Baby J.A.S. over the next few days until the hospital released custody to the Smiths sometime on April 12th.  Compl. at 28.  Mr. Smith

was not permitted to visit Baby J.A.S. or even enter the hospital under threat of arrest for the entire period the hospital retained custody of Baby J.A.S.  Compl. at 5.  At no time during this period were the Smiths afforded a hearing in front of a judge.  Compl. at 28.  The Smiths were not afforded a meaningful conference with hospital employees regarding the custody of Baby J.A.S. until the evening of April 11th nor with CYS agents until the morning of April 12th. Compl. at 5, 29.

Defendants argue in response that Northampton CYS declined to begin an investigation when it received the report from the hospital because the Smiths residence was in Monroe County, and that Monroe CYS did not open a case against the Smith's until the following Monday morning because they were "not available to investigate and did not accept the referral." Def. Resp. Br. at 2-3.

Plaintiffs allege that Northampton CYS received the hospital's report "[s]ometime between April 8 and April 9," and that Northampton CYS "accepted the report sometime on Friday April 9." Compl. at 3-4.  Plaintiffs allege that when they called Monroe CYS for information, Defendant "Tonya 402" told them they "could not do anything" until Monday morning because "the report was made on a Friday, and CYS was closed on the weekend, [and] no caseworker would be assigned" until then.  Compl. at 4-5.

"At some point, a delay in the [post-deprivation] hearing would become a constitutional violation." Cleveland Bd. of Educ. V. Loudermill, 470 U.S. 532, 547 (1985).  Loudermill instructs the Court to assess whether the absence of a post-deprivation hearing was "unreasonably prolonged."  Id.  The Third Circuit has not provided a precedential bright-line rule for the facts in this case.  Cf. Dennis v. Dejong, 557 Fed.Appx. 112, 117 (3d Cir. 2014) ("[T]he County's failure to provide the parents with a pre-deprivation hearing did not amount to a

violation of procedural due process because a post-deprivation hearing was held within 72 hours."); Patterson v. Armstrong Cty. Children and Youth Servs., 141 F.Supp.2d 512, 539 (W.D. Pa. 2001) (holding that the Fourteenth Amendment requires the state "initiate and provide a judicial hearing, with notice and meaningful opportunity to be heard, within 72 hours of taking a child suspected of being abused into protective custody").  "In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken."  Fed. Deposit Ins. Corp. v. Mallen, 486 U.S. 230, 242 (1988); see also Hill v. City of Scranton, 411 F.3d 118, 134 (3d Cir. 2005) ("[The delay must be 'unjustified.'  We have held that the 'mere allegation of a . . . delay without supplementary allegations concerning the cause of the delay does not state a constitutional claim.'") (quoting Ritter v. Cohen, 797 F.2d 119, 124 (3d Cir. 1986)).

The alleged harm suffered by Plaintiffs from the delay was somewhat significant.[8]  Mr. Smith was unable to bond with his newborn for days.  Mrs. Smith was only able to visit Baby J.A.S. under the supervision of hospital security.  The alleged separation of the parents at this time from each other, their other children and their home may be much more than an inconvenience, but was not long enough to make this a slam dunk claim.  The government's justification for the delay has no relation to the underlying government interest—from the facts alleged it appears that Monroe CYS 'sat' on the referral from Northampton CYS until Monday

---

[8] It is unclear for exactly how long the Smiths were denied custody of Baby J.A.S,, and whether it met the 72 hour mark applied in some non-precedential circuit court decisions.  See Patterson v. Armstrong Cty. Children and Youth Servs., 141 F.Supp.2d 512, 539 (W.D. Pa. 2001).  For purposes of this Motion, the Court finds that Baby J.A.S. was held by the hospital for between two and three days; the Court notes the blur of facts that tend to underly these types of claims may lend credence to maintaining a flexible approach as opposed to a bright-line rule.

morning for no apparent reason other than it was the weekend.  While Plaintiffs also allege that

Mr. Shaw informed them Monroe CYS had instructed the hospital on April 10th to call off the

security guards, this does not resolve the agency's failure to open the Smith's case that weekend.

See Puricelli v. Houston, No. 99-2982, 2000 WL 760522, at *1 (E.D. Pa. June 12, 2000) (facts

from summary judgment decision showing Bucks County CYS "commenced" a child abuse

investigation on a Sunday).  The likelihood that the interim decision to take custody of the

newborn was mistaken was significant given Mrs. Smith's prescription for Vyvanse (information

she provided to the hospital), a drug which Plaintiffs allege can result in a positive result for a

urine test that tests for amphetamines undifferentiated from methamphetamines.  See Croft,103

F.3d at 1126 (3d Cir. 1997) ("[A] state has no interest in protecting children from their parents

unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a

child has been abused or is in imminent danger of abuse.").

     Weighing in favor of Defendants is the not-insignificant burden that requiring a nearly

immediate post-deprivation hearing under these alleged facts would likely incur.  See Solomon

v. Philadelphia Housing Auth., 143 Fed.Appx. 447, 454-55 (3d Cir. 2005) (taking into account

the "administrative burden" of making delays "intolerable") (citing Loudermill, 470 U.S. at 544).

     Balancing these factors, the Court finds that the Smiths have not adequately pleaded facts

establishing that they were denied for too long a post-deprivation hearing reviewing the

hospital's decision to take custody of their newborn based on the results of the first drug test and

CYS's decision to retain custody.

     The Smiths also claim that Defendants should have had to provide, under the Fourteenth

Amendment, notice and a court order within 24 hours in order to retain custody of Baby J.A.S.

over the entire period.  The Court does not agree.  While the 24-hour rule is the mark under

Pennsylvania law, federal law has not required such a bright line rule.  The government interest in protecting children from suspected abuse outweighs the need to impose a federal constitutional requirement of a court order.

Count 2 will be dismissed with prejudice.

**E.  Count 3:  Substantive Due Process "Right to Privacy"**

Plaintiffs allege that they are entitled to relief under § 1983 for violations of their substantive due process rights protected under the Fourteenth Amendment, particularly their "right to be free from government intrusion into family privacy, including the birth of a child." Compl. at 34.  Plaintiffs allege that the illegal conduct included:  1) entry into the NICU while Mrs. Smith was breastfeeding Baby J.A.S., 2) the carrying out of inspections of the Smiths at their residence, 3) subjecting Mrs. Smith to an "interrogation," 4) leaving the case against the Smiths open for longer than necessary, 5) examining the Smiths' other children for possible abuse, 6) requests for further drug testing, and 7) the general prying into the Smiths' lives and medical records.  Compl. at 34-35.

Defendants argue that the conduct of which Plaintiffs complain was not improper given the facts surrounding the child abuse report and subsequent investigation, that balancing the intrusive nature of the conduct with the government interest in protecting children does not yield a violation of constitutional rights, and that the gravity of the conduct does not "shock the conscience" as required under the law.

As indicated in the Court's analysis for Count 2, parents have a protected liberty interest in the care, custody, and management of their children.  See infra at 15-16.  The interest is limited and Plaintiffs must adequately plead facts establishing that the government's intrusion on this protected interest was "so ill-conceived or malicious that it 'shocks the conscience.'"  Cty.

Of Sacramento v. Lewis, 523 U.S. 833, 845 (1998).  "The exact degree of wrongfulness necessary to reach the 'conscience-shocking level depends upon the circumstances of a particular case.'"  Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000) (quoting Lewis, 523 U.S. at 375).  The Third Circuit has held that for a social worker accused of constitutional misconduct for separating a parent from their child, "culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'"  Miller, 174 F.3d at 375-76 (3d Cir. 1999). Arbitrariness of the government's conduct dictates how shocking that conduct is, and therefore whether that conduct violates substantive due process.  Id. at 376.

All of the Smiths' allegations of misconduct arise from the opening of a case against them by Monroe CYS and the investigation carried out by Mr. Shaw and Mr. Manteria as part of their responsibilities as CYS caseworkers.  First, a positive drug test indicating potential methamphetamine use is very significant and can be extremely important in affecting speedy life-saving treatment for a newborn child and preventing potential future abuse before the newborn leaves the hospital premises—the Court sees this as one of the paramount reasons behind the physician-custody statute.  See 23 Pa. C.S.A. § 6504.

From the facts as alleged, Mr. Shaw and Mr. Manteria acted closely if not completely on par with the state statutes and regulations governing the responsibilities of child protective services.  The techniques used in the investigation of the Smiths' case, which included requests for additional drug testing and an interview at the parents' residence, are straightforward and routine.  While intrusive to a degree, these techniques are helpful in quickly assessing the situation and coming to a tentative conclusion early on in the process of securing the safety of the child, and it appears from the alleged facts that Mr. Shaw and Mr. Manteria executed them

satisfactorily, especially given the quick resolution allowing Baby J.A.S. to be released from custody.  The techniques' intrusiveness is outweighed by the need to act quickly and protect the welfare of the child.  The Smiths were subject to less intrusive techniques than in other cases where the Third Circuit did not find violations of substantive due process.  See e.g., Miller, 174 F.3d at 376-77 (caseworker requested to physically examine parents' three children); Dennis v. Dejong, 557 Fed.Appx 112, 118-19 (3d Cir. 2014) (CYS restricted parent's visitation rights while proceeding was pending).  The "intensity of interrogation" and "surprise" of the residential visit did not, as alleged, arise to a level that shocks the conscience, but appeared to be necessary to ensure the type of speedy resolution that the Smiths preferred.  The amount of time a case is left open and any further "prying" alleged by the Smiths, while annoying, is necessary to allow CYS to make additional follow-ups in concert with their statutory responsibilities.  As for Mrs. Smith's prescription to Vyvanse, the Smiths did not plead facts showing that a CYS worker failed to factor this information into their investigation—it appears that the speed at which the situation was resolved reflects the weight that that information was given in the investigation, rather than a deliberate indifference to it.  See Ziccardi v. City of Philadelphia, 288 F.3d 57, 66 (3d Cir. 2002) (courts must ask whether the social worker "consciously disregarded a great risk that there had been no abuse").  At no point does it appear from the allegations that a Monroe CYS worker "consciously disregarded" this information.[9]

Because the Smiths have not alleged any conduct concerning their right to privacy that rises to the 'shock-the-conscience' standard, Count 3 will be dismissed with prejudice.

---

[9] The Vyvanse prescription plays a different role in the substantive due process determination than it did in the procedural due process determination.  For the procedural due process claim, it mattered what the likelihood was that the decision to take custody of the newborn was a mistake, and the Court found it was a significant likelihood given Mrs. Smith's daily prescription (and likely ingestion) of Vyvanse; for substantive due process, it only matters whether the caseworkers investigating the case deliberately ignored this information.

**F.   Count 4:  Substantive Due Process "Medical Records"**

In Count 4, the Smiths allege their constitutional rights were violated when Defendants "encouraged" the hospital to disclose the results of Mrs. Smith's drug test as part of their investigation for the Smiths' case.  Compl. at 37.  Beyond the drug test results, it is not clear what other medical records the Smiths believe were disclosed to Defendants in furthering their efforts to resolve the situation.  It is also unclear what injury the Smiths allege occurred from this alleged violation.  See Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000) ("It is axiomatic that a § 1986 action, like its tort analogs, employs the principle of proximate causation.") (internal quotations omitted).

What is clear is medical records fall within the scope of individual privacy interests protected by the U.S. Constitution.  See Doe v. S.E. Pa. Transp. Auth., 72 F.3d 1133, 1137 (3d Cir. 1995) ("Medical records fall within this scope.") (citing Whalen v. Roe, 429 U.S. 589, 599-600 (1977) (medical records are protected as "an interest in avoiding disclosure of personal information")).

The range of protection offered by the right is limited and must be weighed against the government's interest in disclosure of the medical records—"[r]equiring such disclosure to representatives of the State having a responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy."  Whalen, 429 U.S. at 602.  When it comes to drug test results of new parents, it is clear by Pennsylvania's own promulgation of statutes and regulations governing procedures to protect the safety and well-being of newborns that the state has a significant interest in accessing those results.  The Court finds this interest more important than the integrity of horseraces, which the Third Circuit found in Shoemaker justified disclosure to the state individual horse jockeys' drug test results.  See Shoemaker v.

Handel, 795 F.2d 1136, 1144 (3d Cir. 1986) ("The Commission's concern for racing integrity justifies its access to the breathalyzer and urinalysis information").  Additionally, the Smiths' privacy is protected by a state statute imposing criminal liability for willful breaches of confidentiality in child abuse cases.  See 55 Pa. Code § 3490.102; see also Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia, 812 F.2d 105, 118 (3d Cir. 1987) ("Safeguards against disclosure of private material have been held to be adequate when there exists a statutory penalty for unauthorized disclosures.").

Count 4 will be dismissed with prejudice.

### G.  Count 5:  Substantive Due Process "Special Relationship"

In Count 5, the Smiths allege that Defendants had a duty under the U.S. Constitution to "prevent a formation of a special relationship between St. Luke's Hospital and Baby J.A.S.," which Defendants breached when they "allow[ed] St. Luke's Hospital to have uncontested control of Baby J.A.S. for a period lasting more than 24-hours."  Compl. at 41.

The Due Process Clause generally does not impose an affirmative obligation on the state to protect people from other private citizens.  Deshaney v. Winnebago Cty. Dep't of Social Servs., 489 U.S. 189, 196 (1989) ("[O]ur cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid.").  There is an exception to this general rule, known as the "special relationship" exception, which "applies when a special relationship has been established because 'the State takes a person into its custody and holds him there against his will.'"  Morrow v. Balaski, 719 F.3d 160, 167 (3d Cir. 2013) (quoting Deshaney, 489 U.S. at 199-200).

However, the Court does not need consider at this point whether the Due Process Clause imposes an affirmative duty on the state to protect a newborn child held in private or state

protective custody as a result of the mother's positive drug test for potentially illicit drugs.  This is because under the exception, the state would only owe a duty to the individual with which a special relationship was formed—in this case, that would be Baby J.A.S. only, not the parents. Deshaney provides that "[t]he rationale for this principle" lies in the state's assuming the task of caring for an individual "unable to care for himself."  Deshaney, 489 U.S. at 200).  Here, the only Plaintiff potentially eligible for such a relationship would be Baby J.A.S.

Therefore, Count 5 will also be dismissed with prejudice.[10]

### H.  Count 6:  Equal Protection

Mrs. Smith brings a lone equal protection claim against the Monroe County Defendants alleging that she was discriminated against on the basis of her sex based on Defendants' failure to also subject Mr. Smith to a drug test.  Compl. at 47.

Under the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Clause provides that "all persons similarly situated should be treated alike."  Harrington v. UPMC, No. 20-0497, 2022 WL 1606422, at *15 (W.D. Pa. May 20, 2022) (citing Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 151 (3d Cir. 2005)).  As part of stating a valid equal protection claim, a plaintiff "must demonstrate that they received different treatment from that received by other individuals similarly situated."  Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 273 (3d Cir. 2014) (internal quotations omitted).

---

[10] The Due Process Clause also may impose an affirmative duty to protect where the state's own actions create the very danger that causes the plaintiff's injury, also called the "state-created danger theory."  Nicini v. Morra, 212 F.3d 798, 807 n.6 (3d Cir. 2000) ("This theory is predicated on upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger" rather than upon a special relationship between the state and the victim.") (internal quotations omitted).  The same reasoning applies to this exception as the special relationship exception to dismiss the Smiths' claims: that only Baby J.A.S.'s claim would be potentially applicable under this exception.

Here, Mrs. Smith's claim may be dismissed simply because she is not similarly situated to her husband.  Mrs. Smith was a patient of the hospital, while Mr. Smith was not.  Mrs. Smith was also the one who delivered a child, and therefore her, not Mr. Smith, would be capable of passing on the health effects of recent illicit drug use to the newborn child, the main concern of the Monroe County Defendants.  The Smiths did not plead facts suggesting that Defendants deliberately refused to drug test Mr. Smith based on his sex, only that Mr. Manteria told Mr. Smith "not to worry about it."  Compl. at 47.  The Court finds that this lone fact falls short of the mark.  See Id. ("[P]laintiffs must prove the existence of purposeful discrimination.").

Therefore, Count 6 will be dismissed with prejudice.

## V.   <u>CONCLUSION</u>

For the reasoning set forth above, the Court will:

- Grant Defendants' Motion with prejudice as to all claims asserted by Plaintiffs Grace Smith and Michael Smith.

- Refrain from considering all claims asserted by Baby J.A.S. until the parents elect how they would like to proceed pursuant to the accompanying Order.

- Order the Smiths to either 1) retain a lawyer to represent Baby J.A.S. in this litigation (and themselves, if they like), or 2) petition the appropriate state court to appoint a guardian for Baby J.A.S. for the limited purpose of representing the interests of Baby J.A.S. related to this litigation.

The Court will give the Smiths thirty (30) days to decide how to proceed.

An accompanying order follows.